### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| EVAN CASTANEDA, | ) | |
| individually and on behalf of a | ) | |
| class of similarly situated individuals, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 22-cv-3187 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| AMAZON.COM, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Evan Castaneda bought a PlayStation 5 video game console from Defendant Amazon.com, Inc. in November 2020, the month of its release. For six months, the game console apparently worked like a charm. The complaint doesn't reveal what games Castaneda enjoyed. But one can imagine some serious time in a basement with Assassin's Creed, Hogwarts Legacy, Jedi Survivor, or even Goat Simulator 3.

After six months, things started going haywire. The PlayStation 5 began powering down out of the blue, right when Castaneda was in the middle of a game. Just like that – without warning – the game would come to screeching halt, and the console would turn off. By shutting down, the PlayStation 5 would erase all of his hard-earned progress in whatever game he was playing. Anyone who has lived with a gamer can imagine the reaction that likely followed, and the agony emanating from the couch.

Castaneda doesn't think that he is alone in having problems with the PlayStation 5 (or as gamers call it, the "PS5"). He came to believe that the PlayStation 5 is defective. Not just his PS5 – all PS5s. So he took his video game problems to the federal courthouse, purporting to

represent a class of frustrated purchasers of the PS5. Castaneda alleges that PS5s generally – meaning all game consoles, across the board – have a latent defect.

Castaneda didn't sue Sony, the manufacturer of the PlayStation 5. Instead, he sued Amazon, the retailer. He alleges that Amazon made misrepresentations and omissions about the PS5 on its product webpage. He basically alleges that the PS5 is defective, and Amazon knew it. Castaneda points to a small handful of consumer complaints about the PS5 on Amazon's website. He thinks that Amazon knew about the defects because three or four other gamers experienced the same problem.

The complaint includes a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act. Castaneda accuses Amazon of deception by promoting the PS5 despite knowing about a defect. He also brings two warranty claims and an unjust enrichment claim, too. Amazon, in turn, moved to dismiss.

For the reasons stated below, the motion to dismiss is granted.

## Background

At the motion-to-dismiss stage, the Court must accept as true the complaint's well-pleaded allegations. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

This case is about the PlayStation 5 video game console. Even a reader not steeped in video game culture is likely familiar with the PS5, or at least the PlayStation console generally.

The PS5 is a console for playing video games. It is "primarily a video game console which provides many other entertainment functions including television and movie streaming

capabilities and services." *See* Cplt., at ¶ 13 (Dckt. No. 1). If you have a teenager in your family (or an overgrown one), you probably know what it is.

Sony manufactures the PS5. *See* PS5 Amazon Product Page (Dckt. No. 17-1, at 3 of 9).[1] It released the PS5 for sale on November 12, 2020. *See* Cplt., at ¶ 13 (Dckt. No. 1). Lots of retailers offer the PS5 for sale, including Amazon.com. *Id.* at ¶ 2.

Throngs of gamers wanted to get their hands on the PS5, and Plaintiff Evan Castaneda was among them. He purchased a PS5 from Amazon.com in November 2020, the month of its release. *Id.* at ¶¶ 13, 34, 36. He paid $499.99, excluding tax. *Id.* at ¶ 36.

Before buying the PS5, Castaneda reviewed Amazon's product webpage for the console. *Id.* at ¶¶ 28, 34. Amazon's webpage gave information about the product. The language was glitzy, using catch-phrases that gamers might appreciate.

The webpage stated that the PS5 has "lightning fast loading" and "deeper immersion." *Id.* at ¶ 35 (quoting Amazon's PS5 product page). The catchy language included "Breathtaking immersion – Discover a deeper gaming experience," and "Lightning Speed – Harness the power of a custom CPU, GPU, and SSD with Integrated I/O that rewrite the rules of what a PlayStation console can do." *Id.* (quoting Amazon's PS5 product page).

---

[1] The complaint includes a citation to Amazon's webpage, which is reproduced in Defendant's motion to dismiss. *See* Cplt., at ¶ 29 n.12 (Dckt. No. 1). In considering a motion to dismiss, a court may consider "documents attached to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to his claim." *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) ("[T]he incorporation-by-reference doctrine provides that if a plaintiff mentions a document in his complaint, the defendant may then submit the document to the court without converting defendant's 12(b)(6) motion to a motion for summary judgment."). And even where a document is not incorporated by reference, a court may consider it on a motion to dismiss if it is integral to the complaint. *See Gociman v. Loyola Univ. of Chicago*, 41 F.4th 873, 881 (7th Cir. 2022). So, the Court will consider website citations that are included in the complaint.

For the rest of us, it is hard to know what that means.  But the key point is that the game console was fast.  And the gamer would, no doubt, get immersed and engrossed in the game.  It would suck you in, and wouldn't let go.

Amazon's product webpage also included statements about the quality of the games that a gamer could play on the console.  The page stated that the PS5 allowed the user to play "Stunning games – Marvel at incredible graphics and experience new PS5 features."  *Id.* (quoting Amazon's PS5 product page).

Amazon's webpage also represented which video games could be played on the PS5.  It stated that "the PS5 is compatible to play 'an all new-generation of incredible PlayStation games.'"  *Id.* (quoting Amazon's PS5 product page).  And, perhaps unsurprisingly, the PS5 is "the only system that has the compatibility to play PS5 Games."  *Id.* at ¶ 15.

Basically, the complaint alleges that Amazon represented that "the PS5 is a next generation gaming console which functions with exceedingly fast loading times for games, deep gamer immersion, and the compatibility to play the new generation of PlayStation video games."  *Id.*

Castaneda relied on Amazon's representations when deciding to purchase the PS5.  *Id.* at ¶ 36.  He "reasonably believed that the PS5 would function as represented by Defendant on its PS5 product page."  *Id.* at ¶ 37.

For the first six months that Castaneda owned the PS5, the game console apparently lived up to the description on Amazon's website.  *Id.* at ¶ 38.  The complaint does not mention any issues with the product during that time.

But after six months of gaming, Castaneda began experiencing an issue.  His PS5 "would suddenly power down and crash while trying to run PS5 Games, depriving him of the use of his

video game console and of the benefits specifically advertised and promised by Defendant on its PS5 product page." *Id.* Maybe the shutdown brought to a screeching halt a duel with an elf, or a battle with an army of pirates, or a wrestling match with The Hulk, or something along those lines.

Sudden shutdowns cause trouble for gamers trying to play video games. When the PS5 "power[s] down or crash[es], users lose game progress due to the sudden nature of the defect." *Id.* at ¶ 18. The loss of progress in a videogame can be traumatic for the gamer.

The sudden shutdowns are bad for the console, too. When Castaneda rebooted the console, he received a system warning. He "was warned that the manner in which his PS5 has powered down is dangerous and can, or has, caused data loss, corruption, or damage to the overall system." *Id.* at ¶ 39.

Castaneda alleges that this powering-down issue is the result of a defect with the PS5 generally. *Id.* at ¶¶ 3, 16. That is, the problem is not unique to his specific console. *Id.* at ¶ 17. "A common and significant issue among PS5 users is that the PS5 will crash or power down while they are playing video games." *Id.* at ¶ 16. According to the complaint, "[t]he Console Defect exists due to a defect in the design of the PS5." *Id.*

The complaint does not allege what, specifically, causes the PS5's design defect. Instead, the complaint repeatedly refers to the design defect as a "latent defect" in the console. *Id.* at ¶¶ 22, 26, 57–58, 61.

Whatever the cause, Castaneda's machine is still suffering problems. "Plaintiff is now unable to use [his] PS5 for the purpose in which he purchased it for as he has continued to experience random shut downs." *Id.* at ¶ 40.

The defect has limited Castaneda's ability to play PS5-designed video games. One workaround to avoid the shutdowns is to play games for *PlayStation 4* (a different product, one generation earlier) instead of *PlayStation 5*. "Users are oftentimes required to downgrade versions of next generation PS5 Games which they purchased to the PlayStation 4 ('PS4') version of the game to avoid this issue and not risk further damaging their PS5 and losing game progress." *Id.* at ¶ 19.

That workaround means that Castaneda cannot play the games that are designed for the PS5. "Plaintiff was forced to downgrade the PS5 Games which he paid for to their PS4 versions in order to run his PS5 without experiencing the Console Defect." *Id.* at ¶ 40.

Castaneda ultimately took his video game problems to federal court. The complaint includes four claims, including: (1) a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") and comparable statutes from other states; (2) breach of an express warranty; (3) breach of the implied warranty of merchantability; and (4) unjust enrichment. *Id.* at ¶¶ 53–81.

The thrust of the complaint is that Amazon marketed the PS5 in a deceptive manner. The complaint alleges misrepresentations and omissions.

The misrepresentation theory is about the statements that Amazon made about the PS5 on the product webpage. Castaneda was "led to believe, based on representations made by Defendant through its PS5 product page, that the PS5 that [he] purchased was fully functional and free from any defects that would interfere with [his] ability to use the PS5 for its intended use as a video game console, including running new generation PS5 games." *Id.* at ¶ 41. He also alleges that he "reasonably relied on Defendant's representations and warranties that the PS5 would function as warranted, including running PS5 Games free from defect." *Id.* at ¶ 30.

6

The omission theory is about Amazon's failure to disclose the PS5's design defect. "Plaintiff, as well as other consumers nationwide who purchased the PS5, were deceived because Defendant failed to disclose the Console Defect." *Id.* at ¶ 31; *see also id.* at ¶ 43.

Castaneda alleges "[u]pon information and belief" that "Defendant knew or should have known at all relevant times that the PS5 video game consoles contained a latent defect that caused them to malfunction." *Id.* at ¶ 58. "Defendant knew or should have known that selling the PS5 with the Console Defect would result in consumers being frustrated regarding their purchase as they are deprived from being able to play PS5 Games." *Id.* at ¶ 21.

To support that allegation, Castaneda points to the "high rates of negative reviews describing the Console Defect." *Id.*; *see also id.* at ¶ 4 ("Defendant, who was in control of the advertising and sale of the PS5 on its own marketplace, was aware of the Console Defect through online consumer complaints and the overall recognition of the defect in the gaming community.").

But when the time comes to offer specifics, the complaint musters only four examples. Four other gamers experienced the same problem, despite untold hours spent playing the PS5 by untold numbers of gamers.

Because of the design defect, Castaneda alleges that "PS5 owners have suffered damages for loss of use of their PS5, and are forced to either pay to send their PS5 in for repair or attempt to fix the problem themselves." *Id.* at ¶ 33. Castaneda alleges that he "would not have purchased the PS5 from Defendant, or would have paid materially less [for] it," if he had known about the design defect. *Id.* at ¶ 32.

Castaneda brings this case as a class action, hoping to represent "[a]ll persons in the United States who, within the applicable statute of limitations, purchased a PS5 from Defendant

in the United States." *Id.* at ¶ 46. Castaneda also seeks to represent a sub-class of purchasers "who, within the applicable statute of limitations, purchased a PS5 from Defendant in Illinois." *Id.*

Amazon, in turn, moved to dismiss. *See* Def.'s Mtn. to Dismiss (Dckt. No. 17).

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must provide the defendant with fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Claims of deceptive acts or practices under the ICFA require the plaintiff to meet the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure. *See Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019). Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." *See* Fed. R. Civ. P. 9(b). The plaintiff must allege the "who, what, when, where, and how" of the alleged fraud. *See Vanzant*, 934 F.3d at 738.

## Analysis

### I.     The Illinois Consumer Fraud Act Claim (Count I)

Castaneda's first claim involves the Illinois Consumer Fraud and Deceptive Business Practices Act.  The Consumer Fraud Act prohibits "unfair or deceptive acts or practices . . . in the conduct of any trade or commerce."  *See* 815 ILCS 505/2.  As the text reveals, the statute "broadly prohibit[s] unfair business practices."  *See Bell v. Publix Super Mkts., Inc.*, 982 F.3d 468, 474 (7th Cir. 2020).

To state a deception claim under the ICFA, a complaint must allege:  (1) a deceptive act or practice, (2) an intent for the consumer to rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage that was (5) proximately caused by the deception.  *See Phila. Indem. Ins. Co. v. Chicago Title Ins. Co.*, 771 F.3d 391, 402 (7th Cir. 2014); *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 883 (7th Cir. 2005); *see also Sneed v. Ferrero U.S.A., Inc.*, 2023 WL 2019049, at *2 (N.D. Ill. 2023).  Statutes in other states share the same basic requirements.[2]

To satisfy the first element, Castaneda must plead facts plausibly showing a deceptive act or practice.  "[A] statement is deceptive if it creates a likelihood of deception or has the capacity to deceive."  *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2001).  Specifically, Castaneda must plausibly allege that the statement was "likely to deceive a reasonable consumer."  *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020).  Deceptive acts

---

[2]  The complaint includes claims on behalf of putative class members based on "materially identical consumer fraud statutes enacted by states throughout the country."  *See* Cplt., at ¶ 54 (Dckt. No. 1).  The complaint does not allege further information about these state laws.  *Id.* at ¶¶ 55, 62.  So, the Court assumes that these statutes are substantially similar to the ICFA.  *See, e.g.*, *Matthews v. Polar Corp.*, 2023 WL 2599871, at *5 n.4 (N.D. Ill. 2023); *DeMaso v. Walmart Inc.*, 2023 WL 1800208, at *5 n.4 (N.D. Ill. 2023); *Hamidani v. Bimbo Bakehouse LLC*, 2023 WL 167513, at *2 n.2 (N.D. Ill. 2023); *Jacobs v. Whole Foods Mkt. Grp., Inc.*, 2022 WL 3369273, at *2 (N.D. Ill. 2022).

or practices include any "misrepresentation or the concealment, suppression or omission of any material fact." *See* 815 ILCS 505/2.

The deception standard "requires a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Bell*, 982 F.3d at 474–75 (quoting *Beardsall*, 953 F.3d at 972–73); *see also Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) (explaining that the standard is met by a misrepresentation that "is either (1) literally false, or (2) likely to mislead (either through a statement or material omission) a reasonable consumer") (quotation marks omitted).

Whether a statement is deceptive is often an issue of fact. *See Bell*, 982 F.3d at 481. But not always. A case can't get to a jury unless the statement in question could mislead a reasonable consumer. *See id.* at 477; *Bober*, 246 F.3d at 940.

The Seventh Circuit favors a "practical and fact-intensive approach" at this stage. *See Bell*, 982 F.3d at 478. "[W]hen analyzing a claim under the ICFA, the allegedly deceptive act must be looked upon in light of the totality of the information made available to the plaintiff." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019) (alteration in original) (quoting *Davis*, 396 F.3d at 884). But checking common sense at the door isn't required.

Castaneda alleges two deceptive acts. First, Castaneda claims that Amazon made deceptive statements on its product webpage for the PS5. Amazon represented that the PS5 offered a fast, immersive gaming experience when, in reality, it didn't work at all because of a design defect. *See* Cplt., at ¶ 57 (Dckt. No. 1). Second, Castaneda alleges that Amazon knew of the alleged design defect but failed to disclose that defect to consumers. *Id.* at ¶ 58.

The complaint fails to state a claim under the ICFA for a few basic reasons.

10

The first and most basic problem is the lack of a false statement. The simple reality is that Castaneda's game console worked for six months, and then broke. But Amazon never promised that the PS5 would work forever. And it never guaranteed that the machine would not break. It said that the machine would offer a fast, immersive gaming experience.

Castaneda's PlayStation 5 did, in fact, work for half a year. *Id.* at ¶ 38. The complaint does not allege that the machine failed to deliver when he took it out of the box and fired it up. Months of battles with trolls and Storm Troopers apparently followed, without incident. But after six months, the machine apparently went kaput.

The fact that the machine broke cannot give rise to a misrepresentation claim unless Amazon made a false statement that the machine would not break. And here, there is no such allegation. Amazon said that the machine was fast, not unbreakable. Describing an attribute of a product is not the same thing as guaranteeing that the product will always work properly.

Second, at least some of the statements in question are puffery. "Puffing 'denotes the exaggerations reasonably to be expected of a seller as to the degree of quality of his or her product, the truth or falsity of which cannot be precisely determined.'" *Schwebe v. AGC Flat Glass N. Am., Inc.*, 2013 WL 2151551, at *4 (N.D. Ill. 2013) (quoting *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 846 (Ill. 2005)).

Puffery is a statement of "subjective description or opinion," and "is not actionable as a fraudulent misrepresentation." *See High Road Holdings, LLC v. Ritchie Bros. Auctioneers (Am.), Inc.*, 2008 WL 450470, at *4 (N.D. Ill. 2008) (quotation marks omitted). Typically, puffing "signifies meaningless superlatives that no reasonable person would take seriously, and so it is not actionable as fraud." *In re Rust-Oleum Restore Mktg., Sales Pracs. & Prods. Liab. Litig.*, 155 F. Supp. 3d 772, 817 (N.D. Ill. 2016) (St. Eve, J.) (quotation marks omitted).

"Statements of puffery are so vague as to leave the standards for interpretation open to a number of plausible criteria for judgment, and not capable of precise measuring, such that a reasonable consumer would not rely on them." *O'Connor v. Ford Motor Co.*, 567 F. Supp. 3d 915, 962 (N.D. Ill. 2021) (Dow, J.) (quotation marks omitted).

Many of the statements by Amazon merely puffed the product. Amazon said that the PS5 offered "lightning fast loading" and "deeper immersion." *See* Cplt., at ¶ 35 (Dckt. No. 1) (quoting Amazon's PS5 product page). A gamer could "[d]iscover a deeper gaming experience" with "[b]reathtaking immersion." *Id.* And a gamer could "[h]arness the power of a custom CPU, GPU, and SSD with Integrated I/O that rewrite the rules of what a PlayStation console can do," while experiencing "[l]ightning speed." *Id.*

Those statements are not objectively verifiable, and thus cannot be false. Maybe your average gamer knows what those statements mean. And this Court won't ask for a show of hands to see if the reader knows what they mean, either. Still, the key point is that the statements can't be tested, so they can't be verified, so they can't be false.

True, the speed of a game console is something that a person can measure. You can take out a stopwatch and see how quickly a game console can load a game, or process a battle, or deliver who-knows-what visual effects. Even so, no reasonable consumer would expect literal "lightning speed." And once literal lightning is off the table, the applicable standard is in eye of the gamer. How fast is lightning fast?

One possible exception is the statement that the PS5 could play games designed for the PS5. Amazon's product page stated that "the PS5 is compatible to play 'an all new-generation of incredible PlayStation games.'" *Id.* That statement, unlike the others, is objectively verifiable.

12

Either the game console could play PS5 games, or it couldn't.  It's binary.  It is verifiable, so it is not puffery.  Still, that statement cannot give rise to a claim for the reasons that follow.

Third, the complaint does not include enough details to give rise to a plausible inference that the PlayStation 5 suffers from a latent design defect.  The complaint alleges that Castaneda's PS5 broke.  And it alleges that a few other gamers had similar frustrations, too.

But that's about it.  Maybe Castaneda's machine had problems.  Even so, he does not allege facts supporting a plausible inference that PlayStation 5s (writ large) are defective.  The complaint lacks a factual foundation for the conclusion that a latent defect plagues PS5s generally.

The complaint offers almost no facts supporting the notion that the PS5 was defective.  Alleging the existence of a defect, without more, is not enough.  Generalities and conclusions don't cut it.  "An assertion that the [product] was defective, without any factual elaboration, is insufficient, as that statement is a legal conclusion couched as a factual allegation." *Corwin v. Conn. Valley Arms, Inc.*, 74 F. Supp. 3d 883, 889 (N.D. Ill. 2014) (quotation marks omitted).  The existence of a defect is key, because Amazon's representations and omissions were not false or misleading unless the product was defective.  *See Suchanek*, 764 F.3d at 756.

Castaneda puts forward a small set of customer reviews, but they cannot support a plausible inference that the product was defective.  The complaint cites a grand total of four reviews.  Castaneda points to four "internet complaints . . . on Amazon's e-commerce website complaining of system crashes and other failures."  *See* Cplt., at ¶ 22 (Dckt. No. 1).  That's a thin reed given the number of PS5s sold, and given the countless hours devoted in this country to fighting trolls with light sabers.

13

And even then, when looking at those four reviews, and thinking about a potential fraud claim, a few issues jump off the page.

Only three of the four customer reviews were published in November 2020, the month that Castaneda purchased his PS5. The fourth customer review is from December 2021, more than a year after Castaneda purchased the PS5. The reviewer, Edgar Rodriguez, said that the PS5 "[w]as crashing left and right with every disc game." *Id.* at ¶ 22(b).

Of the three reviews from November 2020, two were posted by anonymous Amazon customers. *Id.* at ¶ 22(a), (c). For example, one of the anonymous reviews stated that "[t]he PS5 constantly turn[s] off and on outta nowhere. I'm also getting constant Glitch GPU patter[ns]." *Id.* at ¶ 22(c). The reviewer's identity is anyone's guess.

"[A] list of anonymous and unsubstantiated user comments badly flunks Rule 9(b)." *Sherwin v. Samsung Elecs. Am., Inc.*, 2018 WL 11216896, at *5 (N.D. Ill. 2018) (cleaned up) (quoting *Halperin v. Int'l Web Servs., LLC*, 123 F. Supp. 3d 999, 1008 (N.D. Ill. 2015)). And rightly so. When it comes to particularity (and plausibility, too), the experience of a no-name person does not add much heft to the complaint.

The complaint cites one, and only one, review from an identifiable customer from November 2020. Daanish Fiaz posted a review stating that he "[p]urchased [the PS5], played 1.5 hours, console shuts off on me randomly and now won't [turn] on." *See* Cplt., at ¶ 22(d) (Dckt. No. 1). That's one gamer on one bad day. And even then, maybe Fiaz got his PS5 going again, and enjoyed the rest of his afternoon. Or maybe not.

Putting it all together, Castaneda has come forward with a grand total of four consumer complaints on Amazon's webpage. One of the four complaints came a year after he bought the product. Of the remaining three complaints, two of the three reviewers were anonymous.

14

Viewed as a whole, the small collection of reviews cannot create a plausible inference of a latent defect with the PS5. At best, the allegations are "merely consistent with" the existence of a defect, which "stops short of the line between possibility and plausibility." *See Twombly*, 550 U.S. at 557.

Castaneda cannot fill the void by alleging the existence of a defect "upon information and belief." *See* Cplt., at 1 (Dckt. No. 1). "A plaintiff who alleges fraud can provide all the detail in the world, but does not have unlimited leeway to do so on 'information and belief.'" *Pirelli Armstrong Tire Corp. Retiree Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011). The Seventh Circuit has "ruled that a plaintiff generally cannot satisfy the particularity requirement of Rule 9(b) with a complaint that is filed on information and belief." *Id.*

"The general rule that fraud cannot be pled based on information and belief is not ironclad, however: the practice is permissible, so long as (1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides 'the grounds for his suspicions.'" *Id.* at 443 (quoting *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 924 (7th Cir. 1992)). For example, the Seventh Circuit has noted some flexibility in Rule 9(b)'s application when information lies outside of a plaintiff's control. *See Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1323 (7th Cir. 1998).

In general, the rule exists to "discourage a sue first, ask questions later philosophy." *Pirelli Armstrong Tire Corp.*, 631 F.3d at 441. There is a yawning gap between "I believe there is fraud" and "here are facts plausibly showing fraud."

"[W]hen someone alleges fraud based on information and belief, not just any grounds will do." *Id.* at 443. Rule 9(b) requires that "[t]he grounds for the plaintiff's suspicions must make the allegations *plausible*." *Id.* (emphasis in original).

15

Here, Plaintiff does not muster any plausible basis to suspect a wide-ranging product defect. He contends that there was a design defect based on the customer reviews. *See* Cplt., at ¶ 58 (Dckt. No. 1). Despite claiming that there were a "significant amount of negative reviews," Castaneda comes forward with only four reviews, several of which have major problems.

At bottom, the complaint alleges in conclusory fashion that PS5s suffer from a latent defect. But when it comes to offering supporting facts, the complaint prematurely shuts down.

Fourth, the complaint does not plausibly allege that Amazon knew about the existence of a defect. Knowledge is an essential part of any deception-based claim about an omission (but not, apparently, for a claim about a misrepresentation).[3]

---

[3] The Illinois Supreme Court has ruled that the ICFA does not require knowledge that a statement was false. That's a significant departure from the common law. Ordinarily, in any run-of-the-mill fraud case under the common law (or the federal securities laws, for that matter), a plaintiff must prove that the defendant made a false statement knowingly or recklessly. *See, e.g.*, *Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 1003 (7th Cir. 2018). But under the ICFA, a plaintiff can bring a misrepresentation claim without alleging that the defendant knew that the statement was false. *See Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 754 (Ill. 1994) ("Of note, the Consumer Fraud Act does not require actual reliance, an untrue statement regarding a material fact, *or knowledge or belief by the party making the statement that the statement was untrue*.") (emphasis added); *Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 14 (Ill. App. Ct. 2001) ("Unlike an action for misrepresentation under the [ICFA], *where even innocent misrepresentations can support liability*, an action for fraudulent concealment logically demands that defendants have prior knowledge of the information that they are alleged to have suppressed.") (emphasis added); *see also Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 589 (7th Cir. 2001) ("In most cases under the ICFA, including this one, the seller's knowledge or ignorance about the falsity of its representations is irrelevant."); *Sherwin*, 2018 WL 11216896, at *4. "In contrast to common-law fraud, to state a cause of action for fraud under the Consumer Fraud Act a plaintiff must allege: (1) a statement by the seller; (2) of an existing *or future* material fact; (3) that was untrue, *without regard to the defendant's knowledge or lack thereof of such untruth*; (4) made for the purpose of inducing reliance; (5) on which the victim relied; and (6) which resulted in damages to the victim." *Duran v. Leslie Oldsmobile, Inc.*, 594 N.E.2d 1355, 1362 (Ill. App. Ct. 1992) (emphasis in original). As an aside, it is hard to see how a statement could be deceptive if the speaker doesn't know (or have reason to know) that it is false. After all, not every false statement is a deceptive statement. Not every misstatement is a lie. A statement that "you're reading page 12" might be inaccurate or untrue, but it isn't *deceptive* unless the writer knows what page you're on. In everyday life, and in common parlance, people don't tend to think that they were deceived each and every time someone gives them bad information. That instinct finds support in the statutory text. The ICFA applies to "deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact." *See* 815 ILCS 505/2. All of those words suggest that knowledge of falsity is required. Even the name of the statute sends a signal: it's the Illinois Consumer Fraud and Deceptive Business Practices Act, not the Illinois Misstatements Act or the Illinois Don't Make Mistakes When You Speak Act. As things stand, Illinois law has an asymmetry between

When bringing an ICFA claim based on an omission, it is not enough to allege that PS5s have a defect. To state a claim based on an omission, the complaint also needs to allege that Amazon *knew* about the defect and omitted or concealed it knowing the truth. *See Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 739 (7th Cir. 2017); *Ibarolla v. Nutrex Rsch., Inc.*, 2013 WL 672508, at *3 (N.D. Ill. 2013); *Evitts v. DaimlerChrysler Motors Corp.*, 834 N.E.2d 942, 948 (Ill. App. Ct. 2005) ("Where a plaintiff claims consumer fraud [under the ICFA] on the premise that the defendant concealed or omitted material facts regarding products from potential buyers with the intent that buyers rely on such a concealment or omission, a plaintiff must allege that the fact omitted or concealed was known to the defendant at the time of concealment."). If Amazon did not know of a design defect, then it did not engage in a deceptive practice by omission. *See Schwebe*, 2013 WL 2151551, at *4 ("One cannot engage in a deceptive practice when one lacks knowledge regarding the issue in question.").

The complaint does not allege facts plausibly showing that Amazon was aware of a design defect in the PS5 within days of its release. *See* Cplt., at ¶ 13 (Dckt. No. 1). Again, the complaint cites a few reviews, but they would not have told Amazon much of anything. One review came a year after Castaneda purchased the product. *See Sherwin*, 2018 WL 11216896, at *4 (noting that "[l]ater complaints are irrelevant to whether [the plaintiff] has sufficiently alleged what [the defendant] knew at the time she made her purchase."); *Schwebe*, 2013 WL 2151551, at

---

misrepresentations and omissions. A defendant can get tagged with liability for making a misrepresentation, even if the defendant did not know that the statement was false. But a defendant cannot get tagged with liability for failing to disclose something unless the party knew the truth about what was omitted. That asymmetry is a significant departure from other areas of the law. Usually, the defendant must have known the truth when he said a false statement (*i.e.,* a misrepresentation) or told a half-truth by failing to disclose something (*i.e.,* an omission). Even so, this Court sits in diversity, so it takes Illinois law as it finds it. Maybe the Supreme Court of Illinois will revisit that issue someday.

*5 ("[I]n a case of fraud by omission, one would have to have knowledge of the fact at issue in order to be able to conceal it.").

Two of the reviews were anonymous. One of the anonymous reviewers didn't even post the comment on the PS5 webpage (which dilutes any inference that Amazon knew about a problem with the PS5). The review was posted on Amazon's product page for a PS5 game called "Demon's Souls." *See* 11/13/20 Review (Dckt. No. 17-3, at 2 of 3). The anonymous reviewer complained that "[t]he PS5 is a buggy broken mess. Game crashed within 5 minutes and is completely unplayable." *See* Cplt., at ¶ 22(a) (Dckt. No. 1).

The complaint also cited four articles from the popular press, but they do not support the existence of knowledge by Amazon, either. What matters is Amazon's knowledge at the time of the alleged omissions. *See Schwebe*, 2013 WL 2151551, at *5. Here, the articles appeared after Castaneda purchased the product in November 2020. *See* Wood Article (Dckt. No. 17-7) (published December 8, 2020); Arif Article (Dckt. No. 17-8) (published February 2, 2022); Riley Article (Dckt. No. 17-9) (published February 5, 2022); Sherry Article (Dckt. No. 17-10) (last updated June 30, 2022). They didn't exist at the time of the sale, so they could not give rise to knowledge of a defect (even if Amazon later read them). Articles after November 2020 can't support knowledge in November 2020.

Moreover, the articles primarily provide generic troubleshooting advice – such as checking the power cord, cleaning the console, and removing the PS5 from rest mode. They do not suggest that the PS5 suffered from an overarching design defect, or that generic troubleshooting advice would put Amazon on notice of a design defect.

In a similar vein, Castaneda cannot establish knowledge of an alleged defect simply because Amazon sold the product. Amazon was the retailer, not the manufacturer. Sony, not

18

Amazon, makes the PS5. Selling a product, without more, is not enough to create a plausible inference that the seller knows that the product had problems.

In fact, that level of imputed knowledge doesn't even apply to the *manufacturer*, let alone a retailer. The fact that a company manufactures a product, standing alone, "says nothing about what it knew and failed to disclose." *See Sherwin*, 2018 WL 11216896, at *4 (citing *Evitts*, 834 N.E.2d at 949). "[W]hether [the defendant] knew the [product] suffers from the purported flaw . . . cannot be plausibly inferred simply from the fact that [the defendant] manufactured it." *Id.* If manufacturing a product is not enough to impute knowledge of a defect, then surely selling a product manufactured by someone else is not enough to impute knowledge, either.

If anything, the complaint's allegations suggest that Amazon didn't know, or could not have known, about the problem at the time of sale. Castaneda did not begin having issues with his PS5 until six months after he purchased it. *See* Cplt., at ¶ 38 (Dckt. No. 1).

It is not clear how Amazon could have been aware of a *latent* defect in the PS5 in November 2020, the month that it was released. *See id.* at ¶¶ 22, 26, 57–58, 61. Castaneda didn't know about the alleged defect for six months, so one wonders how Amazon could have known about it sooner.

Taking a step back, Plaintiff's theory of the case is deeply problematic. It would create sweeping liability for retailers, especially retailers like Amazon who sell untold millions of products each year. One can only imagine how many products Amazon sells, and how many customer comments get posted each day. The same is true of other high-volume retailers. It is asking a lot to require retailers to monitor those comments and be on high alert for potential problems with the products, or else face potential liability for fraud.

19

How many products have bad reviews on Amazon.com (or comparable websites), anyway? Is the retailer duty-bound to rifle through the reviews, search for patterns, and ferret out underperforming products, or else risk the possibility of a lawsuit for fraud? Unlikely.

If Plaintiff's theory held water, it is hard to see why every retailer would not face potential fraud liability anytime a few customers encounter a similar problem and complain online. The theory of liability would quickly get out of hand. When it comes to corporate liability, it would be Katy Bar the Door.

It's not hard to find bad reviews, even for good or great products. Anyone who has ever researched a product knows the drill. Even products with high marks – almost all five-star reviews – invariably have a few bad reviews. You can't make everyone happy. And sometimes an individual model does not work correctly. But it is not fraud to sell products with problems, even if some customers are less than satisfied.

If anything, the complaint seems to undermine the theory of the case. How many PS5s did Amazon sell, anyway? Whatever the number is, it's big. And only a few people complained about the game console shutting down? The number of alleged complaints is smaller than the fingers on your hand. It's about the same number of lives you would get playing Ms. Pac-Man.

Castaneda may have experienced issues with the product. Even so, buying a defective product, without more, is not enough to give rise to a fraud claim by a consumer against an online seller. The fact that a few other people had the same problem does not give rise to a plausible inference of fraud, either.

In sum, the Court dismisses Plaintiff's claim under the ICFA.

II.     **Express Warranty Claim (Count II) and Implied Warranty Claim (Count III)**

The complaint also included two warranty claims.  Amazon moved to dismiss both claims, and in response, Castaneda cried uncle on one of the two counts.

One of Castaneda's claims involves the implied warranty of merchantability (Count III). *See* Cplt., at ¶¶ 71–77 (Dckt. No. 1).  In the motion to dismiss, Amazon argued that the conditions of use agreement barred the claim.  *See* Def.'s Mem. in Supp. of Mtn. to Dismiss, at 12–14 (Dckt. No. 18).  In response, "Plaintiff concede[d] Defendant's argument that his implied warranty claims are subject to Defendant['s] Conditions of Use."  *See* Pl.'s Resp., at 15 n.5 (Dckt. No. 23).  Therefore, the Court dismisses Castaneda's implied warranty of merchantability claim.  *See, e.g.*, *Hamidani v. Bimbo Bakehouse LLC*, 2023 WL 167513, at *1 n.1 (N.D. Ill. 2023).

The other claim is about an express warranty (Count II).  That claim falls short, too.

An express warranty claim requires that a seller:  "(1) made an affirmation of fact or promise; (2) relating to the goods; (3) which was part of the basis for the bargain; and (4) guaranteed that the goods would conform to the affirmation or promise."  *O'Connor v. Ford Motor Co.*, 477 F. Supp. 3d 705, 714 (N.D. Ill. 2020).  Illinois law requires that express warranties be created through an "affirmation of fact or promise made by the seller to the buyer." *See* 810 ILCS 5/2-313(1)(a).  However, "a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."  *See* 810 ILCS 5/2-313(2).

To bring an express warranty claim under Illinois law, the buyer must give pre-suit notice to the seller.  *See* 810 ILCS 5/2-607(3)(a) ("Where a tender has been accepted, the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller

of breach or be barred from any remedy."); *see also Sneed*, 2023 WL 2019049, at *4 (dismissing a warranty claim for failure to give "pre-suit notice").

Castaneda seems to concede that he did not give Amazon pre-suit notice of the alleged breach of warranty. *See* Pl.'s Resp., at 13 (Dckt. No. 23). Instead, Castaneda argues that pre-suit notice was not required because it would have been futile. *Id.*

Castaneda cites two cases for the proposition that there is a futility exception to the pre-suit notice requirement. They do not lend a hand.

Castaneda first cites *O'Connor v. Ford Motor Co.*, 567 F. Supp. 3d 915 (N.D. Ill. 2021). But that case did not consider the pre-suit notice requirement under Illinois law. Instead, the case notes that futility is a defense to exhausting informal dispute resolution under federal law. *Id.* at 948–49.

In *O'Connor*, the defendant argued that the plaintiffs' claim under the Magnuson-Moss Warranty Act "must be dismissed for absence of pre-suit notice to Defendant, because Plaintiffs do not allege that they complied with the alternative dispute resolution procedure set forth in the Warranty." *Id.* at 948 (quotation marks omitted). The plaintiffs' complaint did "not allege that Plaintiffs participated in Defendant's alternative dispute resolution procedure." *Id.*

An alternative dispute resolution procedure is not at issue here. Instead, under Illinois law, Castaneda had a duty to "notify the seller of breach or be barred from any remedy." *See* 810 ILCS 5/2-607(3)(a).

Next, Castaneda cites *RDC Case Creek Trails, LLC v. Metropolitan Airport Authority*, 150 N.E.3d 179 (Ill. App. Ct. 2020). That case also did not consider the Illinois statute at issue here. Instead, the court considered whether a party needed to comply with a notice requirement *in a contract* after contract termination. *Id.* at 181–83. The court noted that "[a] party is not

required to send notice when doing so would be futile," such as when "a contract has been terminated or ceases to exist." *Id.* at 183. In those cases, "the act of notice regarding a contractual issue is excused as futile." *Id.*

A contractual notice requirement is not at issue here. An Illinois statute, not a contract, created the pre-suit notice requirement. That statute does not include a futility exception, and Castaneda has not pointed to any authority showing that Illinois courts read a futility exception into the statute. *See* 810 ILCS 5/2-607.

Regardless, even if there were a futility exception, Castaneda has not shown that providing pre-suit notice would have been futile. Castaneda contends that pre-suit notice was futile because "Amazon's returns and refunds policies state that returns for the PS5 must be made within 30 days of the purchase to obtain a refund." *See* Pl.'s Resp., at 13 (Dckt. No. 23). So, because Castaneda was outside that window, he believes that pre-suit notice was futile.

Castaneda's argument mixes and matches agreements. The basis for Castaneda's express warranty claim is not Amazon's refund policy (which is part of its conditions of use agreement). *Id.* Instead, he argues that Amazon's representations on its website constituted an express warranty. *See* Cplt., at ¶¶ 66, 68 (Dckt. No. 1). And that alleged warranty does not include a refund provision. If it did incorporate a 30-day refund policy, then it is hard to see how Castaneda could recover under the warranty anyway. On these alleged facts, providing pre-suit notice to Amazon would not have been futile.

Because Castaneda failed to give Amazon pre-suit notice of the breach of warranty, his claim is dismissed.

### III. Unjust Enrichment Claim (Count IV)

Finally, Plaintiff brings a standalone claim for unjust enrichment. After dismissing the other claims in this case, the unjust enrichment claim is a nonstarter.

"Under Illinois law, unjust enrichment is not a separate cause of action." *Vanzant*, 934 F.3d at 739–40 (quotation marks omitted). "Rather, it's a condition brought about by fraud or other unlawful conduct." *Id.*

Here, the allegations supporting Castaneda's unjust enrichment claim are the same as the allegations that supported his other claims. *See* Cplt., at ¶ 80 (Dckt. No. 1) ("It is inequitable and unjust for Defendant to retain the revenues obtained from Plaintiff's and the other members of the Class and Subclass' purchases of the PS5 from Defendant *because Defendant misrepresented the functionality, qualities, and benefits of the PS5* and Plaintiff and the other members of the Class and Subclass would not have purchased the PS5 from Defendant had Defendant not made these misrepresentations.") (emphasis added). So, "[b]ecause all of Plaintiff's other claims fail, so too does [his] unjust enrichment claim." *Lederman v. Hershey Co.*, 2022 WL 3573034, at *7 (N.D. Ill. 2022); *see also Sneed*, 2023 WL 2019049, at *6; *Cerretti v. Whole Foods Mkt. Grp., Inc.*, 2022 WL 1062793, at *7 (N.D. Ill. 2022).

The Court dismisses Plaintiff's unjust enrichment claim.

### Conclusion

For the foregoing reasons, Amazon's motion to dismiss the complaint is granted.

Date: June 26, 2023

Steven C. Seeger
United States District Judge

24